IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADELA DELORES GREEN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | |
| Commissioner of Social Security | : | NO.  21-5269 |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                June  30, 2023

Adela Delores Green ("Plaintiff") seeks review of the Commissioner's decision

denying her applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI").  For the reasons that follow, I conclude that the decision of the

Administrative Law Judge ("ALJ") is supported by substantial evidence.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on June 23, 2015, and SSI on October 21, 2015,

alleging that her disability began on October 1, 2013, as a result of fibromyalgia and

arthritis in all major joints.  Tr. at 100, 101, 226-31, 238-46, 306.[1]  Plaintiff's applications

were denied initially, id. at 104-08 (DIB), 109-12 (SSI), and Plaintiff requested a hearing

before an ALJ.  Id. at 113.  After holding a hearing on August 17, 2018, id. at 31-81, the

---

[1]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found that
Plaintiff was insured through December 31, 2019.  Tr. at 648.  The most recent Certified
Earnings Record contained in the record dated October 22, 2020, indicates that Plaintiff's
DLI was December, 31, 2017.  Id. at 853.  In Defendant's brief, she indicates that
Plaintiff remained insured through the date of the ALJ's most recent decision, August 26,
2021.  Doc. 11 at 2 n.1.  I will give Plaintiff the benefit of the DLI date utilized by the
ALJ.

ALJ found, on September 26, 2018, that Plaintiff was not disabled.  Id. at 12-24.  The

Appeals Council denied Plaintiff's request for review on August 8, 2019, id. at 1-3,

making the ALJ's September 26, 2018 decision the final decision of the Commissioner.

20 C.F.R. §§ 404.981, 416.1472.

On appeal to this court (Civ. No. 19-4524), Defendant filed an uncontested motion

to remand the case, tr. at 750-51, which I granted on February 25, 2020.  Id. at 755-58.

On March 19, 2020, Plaintiff filed subsequent applications for DIB and SSI, alleging

disability due to sciatica, fibromyalgia, carpal tunnel syndrome, type II diabetes, and

migraines, which were denied at the initial stage.  See id. at 768-69 (Initial Disability

Determination Explanation for application dated 3/19/20), 781 (Disability Determination

and Transmittal for DIB claim filed 3/19/20), 782 (Disability Determination and

Transmittal for SSI claim filed 3/19/20).  The Appeals Council remanded the original

case to an ALJ for further consideration and consolidated the claims filed on March 19,

2020, in the remand order.  Id. at 761-63.

On October 27, 2020, a different ALJ held an administrative hearing, tr. at 673-

722, and on August 26, 2021, the ALJ found that Plaintiff was not disabled.  Id. at 645-

62.  Without exceptions by Plaintiff or the Appeals Council initiating its own review, the

ALJ's August 26, 2021 decision became the final decision of the Commissioner.  20

C.F.R. §§ 404.984; 416.1484(a).

Plaintiff commenced this action in federal court on December 1, 2021, Doc. 1, and the matter is now fully briefed and ripe for review.  Docs. 8, 11-12.[2]

## II.    LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

---

[2]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 5.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   **DISCUSSION**

### A.    **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffers from the following severe impairments: polyarthralgias, degenerative joint disease ("DJD") of the left knee, fibromyalgia,

rheumatoid arthritis ("RA"), plantar fasciitis, obesity, disorders of the spine, and an affective disorder.  Tr. at 648.[3]  The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet the Listings, id. at 649, and that she retained the RFC to perform light work except that she can occasionally lift 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 4 hour and sit for about 6 hours in an 8-hour workday; push/pull the same amount as she can lift/carry; limited to the performance of occasional postural maneuvers but she can never crawl or climb ladders, ropes, or scaffolds, must avoid more than occasional exposure to hazardous machinery, unprotected heights, and vibration; with the ability to understand, carry out, and remember simple and detailed but uninvolved instructions in 2-hour increments sufficiently enough to complete an 8-hour workday in an environment that does not require fast-paced or production-pace work; and requiring no more than frequent interaction with coworkers, the general public, and supervisors.  Id. at 652.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a security guard, armed security guard, or security guard supervisor/dispatcher, but could perform other work that exists in the national economy, including non-postal mail clerk, office helper, storage facility rental clerk, and laundry

---

[3]The ALJ found that the following impairments were non-severe:  allergic rhinitis, myomatous uterus (non-cancerous tumors in the walls of the uterus), genital herpes, diabetes mellitus, hyperlipidemia, hypertension, vaginitis, carpal tunnel syndrome, and migraines.  Tr. at 648-49.  However, the ALJ "considered all of [Plaintiff's] medically determinable impairments, including those that are not severe, when assessing [Plaintiff's] [RFC]."  Id. at 649.

sorter.  Id. at 661-62.  Therefore, the ALJ found that Plaintiff was not disabled from October 1, 2013 through the date of her decision, August 26, 2021.  Id. at 662.

Plaintiff claims that the ALJ erred by (1) rejecting all medical opinions of record and substituted lay opinion for that of a medical provider, (2) improperly rejecting an uncontroverted opinion by a treating psychiatrist, and (3) failing to properly account for Plaintiff's moderate limitations in concentration, persistence, or pace, and failed to include any limitation regarding Plaintiff's inability to stay on task.  Doc. 8 at 4-16; Doc. 12 at 1-8.  Defendant responded that the ALJ was not required to match the RFC to a medical opinion, properly considered the treating psychiatrist's opinion, and properly considered the evidence in crafting the RFC assessment.  Doc. 11 at 5-15.

**B.     Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on March 4, 1972, making her 41 years of age at the time of her alleged onset date (October 1, 2013), and 49 years of age at the time of the ALJ's most recent decision (August 26, 2021).  Tr. at 226, 232, 682.  Plaintiff has a GED and took classes in community college.  Id. at 684.  She has past relevant work as a security guard and security dispatching supervisor.  Id. at 687-88.

Plaintiff testified that she was in a car accident in January 1998 that caused amnesia and injury to her neck and back.  Tr. at 694.[4]  When asked why she could not work from 2013 going forward, Plaintiff explained that she suffers from headaches, neck and back pain, and pain in her feet from standing.  Id. at 694.  Plaintiff took aspirin for

---

[4]At the most recent administrative hearing Plaintiff was not represented by counsel and waived counsel at the beginning of the hearing.  Tr. at 676-77.

headaches, and ibuprofen and Flexeril[5] for back and knee pain. Id. at 695. She also used a knee brace daily and went to a gym with a hot tub for her knee pain. Id. at 696, 703. She has been prescribed physical therapy, but felt that she was doing too much. Id. at 697. Aqua therapy "was okay in the beginning," but when the pool was cold, it made the pain worse. Id. For mental health treatment, Plaintiff talked to a therapist once a week but took no medication. Id. at 704-05.

Plaintiff testified that prior to the pandemic she went to the gym three or four times a week to do physical therapy exercises in the hot tub. Tr. at 703. She also cared for her school-aged autistic son, preparing his meals and cutting and braiding his hair. Id. at 699, 701. Plaintiff goes to the laundry and goes grocery shopping once or twice a week. Id. at 699-700. She also plays games on social media sites to try "to keep myself focused and grounded." Id. at 700.

The VE classified all of Plaintiff's security guard and supervisory work as light as ordinarily performed. Tr. at 711. However, considering Plaintiff's testimony regarding the equipment she carried as an armed security guard, the VE stated that the job was medium as Plaintiff performed it. Id. at 711-12. The ALJ asked the VE to consider someone of Plaintiff's age, education and work experience, who could perform light work with the following limitations: standing/walking four hours a day; occasional postural maneuvers; never climb ladders, ropes, or scaffolds or crawl; avoid more than

---

[5]Flexeril is a muscle relaxant used with rest and physical therapy to treat skeletal muscle conditions such as pain, injury, or spasms. See https://www.drugs.com/flexeril.html (last visited May 30, 2023).

occasional exposure to hazardous machinery, unprotected heights, and vibrations; understand, carry out, and remember simple and detailed but uninvolved instructions in 2-hour increments sufficiently enough to complete an 8-hour workday in an environment that did not require fast-paced or production-pace work, and no more than frequent interaction with coworkers, the public, and supervisors.  Id. at 713-15.  The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of non-postal mail clerk, office helper, storage facility rental clerk, and laundry sorter.  Id. at 714-15.

### C.   Summary of the Medical Record[6]

Plaintiff's mental health treatment records begin in 2016.  When Plaintiff began treatment at NHS Human Services ("NHS") on May 18, 2016, she reported to Jana Rostocki, M.S., that she was diagnosed with fibromyalgia in 2014, and sought treatment for depression with symptoms of irritability, anger, crying, and feeling overwhelmed.  Tr. at 561, 563, 569.  On mental status exam ("MSE"), clinician Rostocki reported normal findings, including no evidence of impairment in her concentration/attention, and intact recent and remote memory.  Id. at 570.  Ms. Rostocki diagnosed Plaintiff with major depressive disorder ("MDD"), recurrent, moderate.  Id. at 571.  In the bi-monthly Treatment Plans, Plaintiff's therapists noted that she was successfully utilizing coping mechanisms, id. at 559 (8/9/16), 557 (10/25/16), that they had built alliances with

---

[6]Plaintiff's claims involve her mental health impairments and limitations in concentrating, persisting, and maintaining pace.  Thus, I will focus on the evidence relevant to those areas.

Plaintiff, and that Plaintiff expressed that she was making progress with controlling her emotions.  See id. at 555 (1/17/17), 551 (6/29/17), 549 (9/15/17).

On October 27, 2017, NHS psychiatrist Abena Apraku, M.D., conducted a Psychiatric Evaluation, noting that Plaintiff presented with worsening depression after a fibromyalgia diagnosis in 2014.  Tr. at 540.  Plaintiff's MSE was predominantly normal with the doctor noting that Plaintiff's thinking was tangential and her speech hyperverbal, but her memory was intact.  Id. at 545-46.[7]  The doctor diagnosed Plaintiff with MDD, moderate, without psychotic features, and prescribed Wellbutrin.[8]  Id. at 546.

On January 18, 2018, Dr. Apraku noted that Plaintiff had not noticed an improvement in her depressive symptoms.  Tr. at 623.  However, Plaintiff's MSE was normal with intact memory, good concentration, and fair insight, judgment, and attention. Id. at 624.  The doctor noted recently increasing Plaintiff's Wellbutrin and adding Cymbalta.[9]  Id. at 623.  In the Treatment Plan dated June 22, 2018, the clinician (Tawanna Green, M.A.) noted that Plaintiff made some progress with decreasing her irritability and enjoying positive activities.  Id. at 629.

---

[7]The categories in the MSE form are blacked out on pages 545 and 546.  However, the categories can be determined in context and using other MSEs contained in the record.  See tr. at 624-25.

[8]Wellbutrin is an antidepressant.  See https://www.drugs.com/wellbutrin.html (last visited May 30, 2023).  Dr. Apraku noted that Plaintiff's primary care physician recently prescribed the antidepressant Lexapro, but Plaintiff stopped taking it due to nausea.  Tr. at 541.

[9]Cymbalta is an antidepressant used to treat MDD and general anxiety disorder. See https://www.drugs.com/cymbalta.html (last visited May 30, 2023).

There appears to be a gap in the treatment record, as there are no notes from Dr. Apraku covering the period for January to June 2018.  There is a June 14, 2018 Transfer Summary memorializing Plaintiff's transfer from Dr. Apraku to Dimal Shah, M.D., including a summary of Plaintiff's treatment with Dr. Apraku, including the medications previously noted.  Tr. at 618.  However, the Transfer Summary indicates that on February 26, 2018, Plaintiff had not been taking Wellbutrin for months and forgot to tell the provider that she stopped taking it.  Id. at 619.  Additionally, the Transfer Summary indicates that Plaintiff's Wellbutrin was discontinued on February 26, 2018, and her Cymbalta was increased on February 26 and again on March 26, 2018.[10]  Id.

On March 27, 2018, Dr. Apraku completed a Treating Source Statement, tr. at 612-16, indicating that Plaintiff suffered from anhedonia, appetite and sleep disturbance, and difficulty concentrating.  Id. at 613.[11]  The doctor indicated that Plaintiff's abilities to understand, remember, or apply information, to interact with others, and understanding and memory were "Not Limited."  Id. at 614.  Plaintiff's ability to concentrate, persist, or

---

[10]The treatment notes for February 26, March 26, April 23, and May 21, 2018 (presumably Dr. Apraku's), referred to in the Transfer Summary are not contained in the record.

[11]The form required the doctor to use a 5-point scale measuring the individual's ability to function independently, appropriately, effectively, and on a sustained basis: "No Limitation," "Mildly Limited" meaning the ability to function is slightly limited, "Moderately Limited" meaning the ability to function is fair, "Markedly Limited" meaning the ability is seriously limited, and "Extremely Limited" meaning the individual is unable to function.  Tr. at 614.  If the doctor indicated "Moderately Limited," "Markedly Limited," or "Extremely Limited," the form required the doctor to describe the degree and extent of limitation in narrative form.  Id.

maintain pace was "Mildly Limited," and the doctor included a narrative: "[patient] reports instances of difficulty with concentration & focus as manifested by greater difficulty in making decision and inability to make up mind." Id.   Additionally, the doctor indicated that Plaintiff's ability to adapt or manage herself was "Mildly Limited." Id.  When asked about Plaintiff's functional limitations, the doctor indicated that Plaintiff was not limited in her ability to remember locations and work-like procedures, understand and carry out very short and simple instructions, and understand and carry out detailed but uninvolved written or oral instructions. Id. at 615.  The doctor noted that Plaintiff can maintain attention and concentration for less than thirty minutes before needing redirection or requiring a break. Id.  In addition, Dr. Apraku indicated that Plaintiff would be "off task" -- defined as how much of a typical workday the patient's symptoms would be severe enough to interfere with the attention and concentration needed to perform even simple work-related tasks -- 15% of the day. Id. at 616.  Finally, the doctor indicated that Plaintiff would be absent three days a week as a result of her impairments and treatment. Id.

On January 25, 2018, Ramprasad Patnaik, M.D., Plaintiff's primary care physician, completed a Treating Source Statement, addressing Plaintiff's physical impairments. Tr. at 533-36.  When asked the diagnoses for which the doctor treated

Plaintiff, he included only physical impairments, not her depression.  Id. at 533.  The doctor indicated that Plaintiff would be "off task" for more than 25% of the time.  Id.

There are no state-agency opinions regarding Plaintiff's mental limitations.[12]

**D.    Plaintiff's Claims**

All of Plaintiff's claims involve her mental impairment/limitations and focus on the ALJ's rejection of Dr. Apraku's opinion that Plaintiff would be off task for 15% of the workday and could maintain attention for less than 30 minutes before needing redirection or requiring a break.  Doc. 8 at 5.

1.    RFC Unsupported by Medical Opinion

Relying on the Third Circuit's decision in Doak v. Heckler, 790 F.2d 26 (3d Cir. 1986), Plaintiff first complains that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ rejected the only medical opinion in the record regarding Plaintiff's mental limitations and substituted her opinion for that of the medical providers.  Doc. 8 at 5-10.  Defendant responds that the ALJ's RFC determination need not mirror a medical opinion.  Doc. 11 at 5-7.  Plaintiff counters that "when a medical opinion is present and the ALJ rejects that opinion without a proper basis, the decision is

---

[12]At the initial consideration stage of Plaintiff's original applications, a single-decision maker ("SDM") considered the record and the ALJ correctly found that the opinions were not from an acceptable medical source.  Tr. at 657; see also Yorkus v. Astrue, Civ. No. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2011) (Strawbridge, M.J., approved and adopted Mar. 25, 2011, Davis, J.) (compiling cases) (SDM is not an acceptable medical source).  In Plaintiff's subsequently filed applications, only her physical impairments were considered at the initial consideration stage because she did not allege any mental impairment.  Tr. at 769.

not supported by substantial evidence."  Doc. 12 at 4 (citing <u>Sanders v. Berryhill</u>, Civ.

No. 16-2160, Report and Recommendation (M.D. Pa. Dec. 11, 2017)).[13]

Before addressing the ALJ's RFC assessment, I first review the ALJ's

consideration of Dr. Apraku's opinion.  According to the opinion weighing paradigm

applicable to Plaintiff's case,[14] a treating physician's "opinion may be afforded 'more or

less weight' depending upon the extent to which supporting explanations are provided."

<u>Brownawell v. Comm'r of Soc. Sec.</u>, 554 F.3d 352, 355 (3d Cir. 2008) (quoting <u>Plummer</u>

<u>v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)); <u>see</u> <u>also</u> Social Security Ruling ("SSR") 96-

2p, "Policy Interpretation Ruling:  Giving Controlling Weight to Treating Source Medical

Opinions," 1996 WL 374188 (providing for controlling weight where treating physician

opinion is well-supported by medical evidence and not inconsistent with other substantial

evidence in record).  "The ALJ must consider all the evidence and give some reason for

discounting the evidence she rejects."  <u>Plummer</u>, 186 F.3d at 429 (citing <u>Stewart v. Sec'y</u>

<u>HEW</u>, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the

ALJ may choose which evidence to credit and which evidence not to credit, so long as

---

[13]Plaintiff's counsel provided a copy of <u>Sanders</u> upon my request.  <u>See</u> Docs. 13-14.

[14]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  <u>See</u> Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's original applications were filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.  <u>Compare</u> 20 C.F.R. §§ 404.1527, 416.927 (applicable to claims filed prior to March 27, 2017) <u>with</u> §§ 404.1520c, 416.920c (applicable to claims filed on or after March 27, 2017).

she does not "reject evidence for no reason or for the wrong reason." Rutherford v.

Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting

Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

As previously discussed in reviewing the record, in her Treating Source Statement,

Dr. Apraku found that Plaintiff's ability to concentrate, persist, or maintain pace was

"mildly limited," and noted that "[patient] reports instances of difficulty with

concentration & focus as manifested by greater difficulty in making decisions and

inability to make up [her] mind." Tr. at 614.  The doctor also found that Plaintiff was not

limited in her abilities to remember locations and work-like procedures or to understand

and carry out either very short and simple instructions or detailed but uninvolved

instructions.  Id. at 615.  However, the doctor also found that Plaintiff would be off task

15% of the normal workday and could maintain attention and concentration for less than

30 minutes before needing redirection or a break.  Id. at 615-16.

The ALJ afforded Dr. Apraku's opinion "little weight," noting that "Dr. Apraku's

findings related to time off task and absenteeism are not [supported by/consistent with the

overall evidence]."  Tr. at 659.

> [Plaintiff's] mental health treatment has been routine and
> conservative overall.  She received some formal treatment at
> NHS and later Merakey.  But, . . . [MSEs] performed during
> formal mental health treatment visits show largely only mild
> to moderate abnormalities ([tr. at 538-88, 617-39]).
> [Plaintiff] has not been psychiatrically hospitalized or
> presented to the [emergency department] for psychiatric
> purposes during the period at issue.  [Plaintiff] has also not
> sought any mental health treatment since 2018 (Hearing
> Testimony).  [Plaintiff] admitted to significant activities of
> daily living, including daily social media activities, childcare

> activities, scheduling and maintaining medical appointments
> for herself and her sons, and driving several times per week
> (Hearing Testimony).
>
> Dr. Apraku's limitations are somewhat internally
> inconsistent.  She afforded [Plaintiff] no limitation or a mild
> limitation in every mental functional area.  She also found
> [Plaintiff] to be able to maintain regular attendance and
> punctuality.  Yet, she afforded [Plaintiff] off task and
> absenteeism limitations that are well beyond the limitations
> she already opined on regarding [Plaintiff's] ability to focus
> and to show up for work consistently.

Id.

The ALJ's assessment of Dr. Apraku's opinion is supported by substantial

evidence.  First, contrary to Plaintiff's contention, see Doc. 8 at 10, the doctor's

assessment is somewhat inconsistent.  At the same time the doctor found that Plaintiff's

ability to concentrate, persist, or maintain pace was only mildly limited, defined as a

slight limitation, she also found Plaintiff would be off task for 15% of the time and could

maintain attention and concentration for less than 30 minutes before needing redirection

or a break.  Tr. at 615.  The ALJ did not err in interpreting these findings as internally

inconsistent.  Plaintiff contends that the finding of a mild limitation rather than a

moderate limitation in concentration is "irrelevant," because the doctor found Plaintiff

would be off task for 15% of the workday.  Doc. 8 at 10.  However, the court will not

cure an inconsistency in the doctor's report by crediting some portions of it while

ignoring others.

Moreover, the treatment records from NHS, including Dr. Apraku's own records,

do not support the doctor's conclusions that Plaintiff would be off task 15% of the time

and could not maintain concentration for 30 minutes or more.  When Plaintiff began

treatment at NHS in May of 2016, although clinician Rostocki noted that Plaintiff had a tangential thought process and went "into story telling mode" in answering questions, she found on MSE that Plaintiff's concentration was "[g]ood," with "[n]o [e]vidence of [i]mpairment," and she exhibited good judgment and insight, with intact immediate, recent, and remote memory.  Tr. at 569-70.  When Dr. Apraku evaluated Plaintiff on October 27, 2017, the doctor noted that Plaintiff complained of poor concentration, along with other symptoms of depression stemming from her chronic pain.  Id. at 540.  On MSE, the doctor indicated that Plaintiff had a tangential thought process and was hyperverbal, but also found that her immediate, recent, and remote memory were intact, and that there was no evidence of impairment in Plaintiff's concentration.  Id. at 546.  Similarly on January 18, 2018, the doctor found that Plaintiff had intact thought process, intact memory, fair judgment, insight, and attention, and good concentration.  Id. at 624.  Thus, the ALJ's decision to give "little weight" to the limitations imposed by Dr. Apraku is supported by substantial evidence.[15]

Having determined that the ALJ's consideration of Dr. Apraku's opinion was supported by substantial evidence, I turn to Plaintiff's claim that the ALJ's RFC assessment runs afoul of Doak and is not supported by substantial evidence because the ALJ rejected the only medical opinion addressing Plaintiff's mental limitations.  Doc. 8

---

[15]The ALJ also properly relied on the conservative nature of Plaintiff's mental health treatment in assessing Dr. Apraku's assessment.  See Myers v. Comm'r of Soc. Sec., 684 F. App'x 186, 192 (3d Cir. 2017) (ALJ appropriately discounted treating physician's opinion based in part on conservative treatment).  To the extent Plaintiff challenges the ALJ's reliance on her daily activities, I will address the claim in the next section.

at 6.  In <u>Doak</u>, the Third Circuit held that the ALJ's decision that the plaintiff was able to perform light work was not supported by substantial evidence because "[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work."  790 F.2d at 29.  The judges of this district have not read <u>Doak</u> to require the ALJ to adopt a medical opinion for each component of the RFC assessment.

> <u>Doak</u> does not stand for the proposition that an ALJ cannot make an RFC determination in the absence of a medical opinion reaching the same conclusion.  Such a rule would be inconsistent [with] the Third Circuit's express holding that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  Rather, the Court in <u>Doak</u> held that the ALJ's opinion was unsupported because nothing in the record, which consisted of testimony and three medical reports, justified the ALJ's conclusion.  Contrary to Plaintiff's contention, the more recent, nonprecedential Third Circuit and district court opinions . . . clarify, rather than contradict, <u>Doak</u>'s holding, and make clear that an ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination.

<u>Cleinow v. Berryhill</u>, 311 F. Supp.3d 683, 685 (E.D. Pa. 2018) (footnotes and sources omitted); <u>see</u> <u>also</u> <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining the RFC.  Surveying the medical evidence to craft an RFC is part of the ALJ's duties.").

Plaintiff attempts to distinguish this case from other cases interpreting <u>Doak</u>, arguing that here the ALJ rejected the only medical opinion regarding Green's mental impairments/limitations, and finds support for her argument in the <u>Sanders</u> decision. Doc. 12 at 3 (citing <u>Sanders</u>, at 11) & 6.  In <u>Sanders</u>, the Honorable Joseph F. Saporito,

Jr., explained that the holding in Doak "was directed by a simple application of the substantial evidence standard." Sanders, at 11. "The ALJ in Doak was not reversed because he was procedurally required to have a supporting medical source opinion, but rather because the sum total of the record provided less than a scintilla of evidence in support." Id. Here, Plaintiff argues that because the ALJ rejected the only medical opinion regarding Plaintiff's mental impairments/limitations, the ALJ necessarily substituted his lay opinion for that of a medical provider and that without any medical evidence to support the RFC with respect to Plaintiff's mental limitations, the RFC is not supported by substantial evidence and runs afoul of Doak.

I reject Plaintiff's argument for two reasons. First, as previously mentioned, Plaintiff relies on Sanders in support of her argument that rejection of Dr. Apraku's assessment results in the conclusion that the ALJ's decision is not supported by substantial evidence. Sanders undermines this argument. In Sanders, the court explained that "opinions on functionality 'are not medical opinions as [defined] in [the regulations], but are, instead, opinions on issues reserved to the Commissioner . . . .'" Sanders, at 12-13 (quoting 20 C.F.R. § 404.1527(d)).

> The assertion that an ALJ's [RFC] [assessment] must find support in a medical source opinion on function is implausible in light of the regulations' treatment of such opinions (directing that they be afforded "[no] special significance"). [20 C.F.R. § 404.1527(d)(3)]. Likewise, the assertion that the record must at least contain a medical source opinion on function seems dubious, given that the value of the presence of such an opinion is called into serious doubt because the regulations treat them with no special significance.

Sanders, at 13.  Thus, even absent a medical source opinion on function, the ALJ is required to "[s]urvey[] the medical evidence to craft an RFC."  Titterington, 174 F. App'x at 11.

Second, Plaintiff's argument is based on a false premise.  The ALJ did not reject Dr. Apraku's assessment.  The ALJ noted that "some of [Dr. Apraku's] findings . . .  are supported by/consistent with the overall evidence, such as the findings related to the 'paragraph B criteria,'" tr. at 659, and the ALJ incorporated such findings in her RFC assessment.  Compare id. at 652 (RFC assessment that Plaintiff  "can understand, carry out, and remember simple and detailed but uninvolved instructions in 2-hour increments sufficiently enough to complete an 8-hour work day in an environment that does not require fast-paced or production-pace work, and that requires no more than frequent interaction with coworkers, the general public, and supervisors") with id. at 615 (Dr. Apraku's Treating Source Statement indicating no limitation in remembering locations and work-like procedures, understanding and carrying out very short and simple instructions, and understanding and carrying out detailed but uninvolved written or oral instructions).  However, the ALJ specifically found that Dr. Apraku's limitations with respect to Plaintiff being off task 15% of the time and her absenteeism were not consistent with the record and did not incorporate those limitations in the RFC assessment.  Thus, the ALJ surveyed the medical evidence, determined the extent to which Dr. Apraku's findings were consistent with and supported by the treatment records, and crafted the RFC accordingly.  Contrary to Plaintiff's argument that "[t]he sum total of the record provides less than a scintilla of evidence in support" of the RFC

assessment, I conclude that the record, including Dr. Apraku's treatment notes and other portions of her Treating Source Statement, provide ample support for the mental limitations included in and excluded from the RFC assessment.

> 2.      Use of Activities of Daily Living in Crafting the RFC

Plaintiff claims that the ALJ improperly relied on her activities of daily living in rejecting Dr. Apraku's opinion, arguing that such reliance violates Third Circuit precedent and Plaintiff's activities do not undermine Dr. Apraku's assessment that Plaintiff would be off task 15% of the workday.  Doc. 8 at 11-13.  Defendant responds that the ALJ properly relied on Plaintiff's activities as one of many bases in considering Dr. Apraku's assessment.  Doc. 11 at 10-12.

First, I note that Plaintiff's daily activities were just one of several bases for the ALJ's determination that Dr. Apraku's assessment concerning the time Plaintiff would be off task was not consistent with the record.  Tr. at 659.  Moreover, Plaintiff's argument is based on the Third Circuit's decision in Smith v. Califano, in which the court held that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  637 F.2d 968, 971 (3d Cir. 1981).  In Smith, the court noted that the ALJ heavily relied on the fact that the plaintiff "does shopping and . . . went hunting twice."  Id.  The court further noted that "shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days."  Id. "[S]poradic or transitory activity does not disprove disability."  Id. at 971-72.

20

Here, rather than sporadic or transitory activity, the activities upon which the ALJ relied were Plaintiff's daily activities, including caring for her autistic son who was 10 years old when Plaintiff first applied for benefits and 17 at the most recent hearing.  Tr. at 683, 701.[16]  Plaintiff testified that prior to the pandemic, she drove him to school, and described that he is particular about the food that he eats, so she often has to go to the store.  Id. at 683, 701.  In her Function Report, Plaintiff stated that she makes complete meals and starts dinner early so that she is finished by the time her son is home from school.  Id. at 345.  She also cuts his hair and braids it.  Id. at 701.  Plaintiff also reported that she plays games daily on Instagram and Facebook "to keep myself focused and grounded," and described herself as "addicted" to Candy Crush Soda Saga.  Id. at 700.  In addition to the activities specifically mentioned by the ALJ, Plaintiff also indicated that she enjoys watching television, reading, and watching basketball and football games, and would attend her daughter's high school basketball games twice a week.  Id. at 346.  Far from "vegetat[ing] in a dark room," Plaintiff partakes in significant and varied daily activities, and I find no error in the ALJ's consideration of her activities in assessing Dr. Apraku's opinions.

3.    Moderate Limitations in Concentration, Persistence and Pace

Plaintiff also complains that the ALJ failed to account for her moderate limitations in concentration, persistence, and pace by failing to include any limitations on her ability

---

[16]Although the ALJ referred to Plaintiff's sons, tr at 659, the record suggests that she has only one son.  Id. at 683.  Plaintiff also has a daughter who was  22 years old at the time of the most recent hearing.  Id.

to stay on task.  Doc. 8 at 13-16.  Defendant responds that substantial evidence supports the ALJ's RFC finding with respect to concentration, persistence, and pace.  Doc. 11 at 12-15.

The inter-relationship of the findings at step 3, involving the B criteria of the mental health Listings, and the RFC assessment has been the focus of several opinions in this circuit, culminating in the Third Circuit's decision in Hess v. Commissioner of Social Security, 931 F.3d 198 (3d Cir. 2019).  In Hess, the court reiterated that the findings at step 3 must be "adequately conveyed" in the RFC assessment.  Id. at 210 (citing Ramirez v. Barnhart, 372 F.3d 546, 552 n.2 & 554 (3d Cir. 2004)).  "In short, the functional limitation findings [of step 3] do not dictate the terms of the ALJ's statement of the claimant's limitation in the final analytical steps.  But those findings are relevant to that statement of the limitation, which must be sufficient to reflect all of a claimant's impairments."  Id.  In order to determine the sufficiency of the ALJ's RFC assessment, "it is essential to assess whether a valid explanation has been given for [the RFC assessment]."  Id. at 213.

In Hess, the question was whether the ALJ's limitation to "simple tasks" in the RFC assessment was sufficient to address the moderate difficulties in concentration, persistence, and pace the ALJ found at step 3.  931 F.3d at 200-01.  Based on the ALJ's discussion, the Third Circuit found that the ALJ provided "a valid explanation for [a] 'simple tasks' limitation . . . . [because] the ALJ explained at length and with sound reasoning why Hess's 'moderate' difficulties in 'concentration, persistence, or pace' were not so significant that Hess was incapable of performing 'simple tasks.'"  Id. at 213.

Here the ALJ specifically found, based on Dr. Apraku's assessment, that Plaintiff can understand, carry out, and remember simple and detailed but uninvolved instructions in 2-hour increments, and further limited Plaintiff to jobs that do not require fast-paced or production-pace work.  Tr. at 652 (RFC assessment), 615 (Dr. Apraku's assessment).  In a repackaging of her first claim, Plaintiff complains that the ALJ erred in failing to include limitations regarding her ability to stay on-task.  Doc. 8 at 13.

As previously discussed, the ALJ properly discounted this portion of Dr. Apraku's assessment because it was inconsistent with her own treatment notes, the notes of other providers at NHS, Plaintiff's conservative treatment, and Plaintiff's daily activities.  See supra at 15-16, 21-22.  Consistent with Hess, the ALJ explained that the mental limitations in the RFC assessment were consistent with the medical record and adequately addressed Plaintiff's moderate limitations in concentration, persistence, and pace.  The ALJ noted that although Plaintiff complained of attention difficulties, tr. at 651 (citing id. at 351 - Function Report indicating difficulties paying attention due to medication causing sleepiness,[17] 540, 547), on examination, Plaintiff repeatedly showed good concentration.  Id. at 651 (citing id. at 570, 574, 584).  As previously discussed, the ALJ included in his RFC assessment the limitations in Dr. Apraku's assessment which

---

[17]In the Function Report Plaintiff completed December 27, 2015, Plaintiff was asked to place a check mark in the boxes corresponding the abilities that her conditions affected.  Tr. at 351.  Plaintiff did not indicate that her conditions affected her concentration, but indicated that her ability to pay attention was affected by medication because it caused drowsiness.  Id.  In the Function Report Plaintiff completed on June 24, 2020, she indicated that her conditions did affect her concentration, but stated that "I can pay attention somewhat."  Id. at 898.

were supported by the treatment record.  See supra at 19-20.  Therefore, I conclude that the ALJ properly accounted for the moderate limitation in concentration, persistence and pace he found at step 3 of the evaluation.

IV.     **CONCLUSION**

The ALJ's decision is supported by substantial evidence.  The ALJ properly considered the opinion evidence, including the limitations supported by the record in his RFC assessment, and properly accounted for the moderate limitation in concentration, persistence, and pace in crafting the RFC assessment.

An appropriate Order follows.